Your Honors, may it please the Court, I'm Norwood Blanchard again and I'm here in this matter on behalf of the Defendant's Appellants. This case is a qualified immunity case, or those are the primary issues that we're arguing about here as well. It arises out of the Plaintiff's termination as police officers for the Village of Bald Head Island. The incidents at issue took place in September of 2014, I believe, I'm trying to remember if it was 14 or 15. In any event, the Plaintiffs had 15, I apologize, August of 15 and early September of 15. The Plaintiffs had engaged in a text message exchange, and the text message exchange is in the record so there's no dispute about what was actually said, that essentially consisted of jokes among police officers who were on the public safety force for the Village of Bald Head Island. Let me ask you a preliminary question, we've got a lot to get to here, but I want to make sure that we cover this. I want to skip to the defamation issue. Tell us your basis for our jurisdiction to hear that part of the case. Why do we have federal jurisdiction over this interlocutory appeal for that issue? The question of whether the actual malice standard has been met in a defamation case against a public official is one that's immediately appealable under North Carolina law. What does that have to do with federal jurisdiction? It's a state law claim, just as if, say for example, this were a public official immunity case, the court here has jurisdiction over it, it's supplemental jurisdiction or whatever you call it. We have, I mean there are cases, including North Carolina state claims in federal court where we have recognized under the collateral order doctrine that there is jurisdiction for a public official, a state public official immunity claim, but that's not a per se rule for all cases. And my recollection from your brief was that you argued that we had collateral order jurisdiction because there was a North Carolina rule that permitted appeal, but I don't think that cuts any ice for federal jurisdictional purposes. It's a substantial right, just like public official immunity would be under North Carolina law. All we're changing is the form. I apologize, Your Honor. Can you help me with the authority you have for that proposition because you would acknowledge, I suspect, that it's fairly unusual for federal jurisdiction to be dependent on the existence of the state recognition of a right to appeal an interoperatory order. Right. It would be, I guess what I'm trying to say is it would be a final order under 28 U.S.C. section 1291 just like, you know, qualified immunity would be because it essentially deprives them of a right, the right not to stand trial on that issue. And I don't know that it's been specifically litigated in federal court, although we did cite, I believe, Bowes Court versus Consumers Union that, you know, that it's reviewed under a de novo standard and Anderson versus Liberty Lobby, I believe, also is one of those cases where it was, that question was raised. But most of the time it does come up, the defamation cases, it comes up later. It does. And I'm not shaking my head about that. I just am having, I've not seen, this is an interesting, this is a quirky argument and I'm trying to parse it in my mind. I do, I don't want to belabor this because you've got some other issues, but the, in your briefing you discuss the headings deal with actual malice. So there has to first be a prima facie case of defamation before you get to actual malice. But your actual brief argument doesn't deal with actual malice. It goes to the elements of defamation as to, as it falls as an opinion and it just, there seems to be a disconnect there. Now that may or may not be related to the jurisdictional question, but it is something of a puzzle. I'll tell you where, unfortunately I covered that in more depth in the reply brief. Because remember actual malice, you have to show that subjectively the defendant who uttered those, the alleged defamation, knew that it wasn't true or subjectively had strong reason to believe it wasn't true. The issue in that one, the reason that actual malice isn't shown here for Peck, for example, is that everybody agrees that the evidence, what came to him was Dr. Mitchell coming to him saying, I got this complaint. I got this complaint. So I got this complaint and that I've talked with my command staff and they all agree that these guys, you know, were being disrespectful, were being abusive and that they need to be terminated. So Peck didn't know that there wasn't a complaint. Now allegedly Dr. Mitchell did, according to the plaintiff's evidence, Dr. Mitchell knew that there wasn't a true complainant, but that evidence never got to Peck. So he wouldn't have known that nobody complained about it. The only thing he knew was that somebody did complain about it. Their contention is that he didn't investigate that any further, but should have. But we know, as I pointed out in the brief, a failure to investigate before you publish is an actual malice under Fourth Circuit law or under U.S. Supreme Court law. So that's where the actual malice standard comes into play with respect to Peck. I'm sorry, but I have to go back to this interlocutory order for just a second. It's asked that it's qualified immunity, a claim of qualified immunity arises in the context of someone's judgment. Does it not? And you appeal and you argue that you're entitled, it's immediately appealable because it raises an issue of qualified immunity. But the determination is whether it turns on a question of pure law or whether there's a factual underpinning. Because if there's a factual underpinning to the summary judgment question, then it's not appealable because it's just a summary judgment. How does this differ? How does it differ in the case of the defamation case against a public official? Now that is a really good question about it, Your Honor, because you're correct that ordinarily it wouldn't be in a qualified immunity saying, arguing about, in a qualified immunity, if we agree what the law is, we're not arguing about the law, we're arguing about whether there was a tribal issue of fact. Right. And that's not appealable. That's not appealable. Now, it's different, though, for defamation because remember the trial judge has an independent duty under the case law and the court of appeals has to make, Boe's tells us, Boe's court, they have to make a de novo independent review of whether there's sufficient evidence to survive summary judgment and even go to trial. Now, that also is what the Desmond versus In-N-O Publishing Company case that I cited, you know, in our brief from the North Carolina Court of Appeals says, that it becomes a legal issue as to whether it goes to the jury or not. It's illegal. And I know that that's strange because you look at it, like you said, in the qualified immunity lens, arguing about the sufficiency of the evidence argues me out of court on an appeal. But it doesn't when it comes to defamation claims. So, if there's a conflict in the evidence, that's not a factor? Well, you still have to take the evidence in the light most favorable to the plaintiff. But the question then, and again, if I want to analogize it to qualified immunity, would be if the evidence that they've shown here that Peck didn't investigate it, would that survive summary judgment or should it survive summary judgment? Would it make out an actual malice case to go to the jury? And our contention is no, it wouldn't. So, that's the odd part. We're not arguing an alternative view of the facts here. Our argument is even under their view of the facts, it's not actual malice. I'm using the plaintiff's evidence on that to say that what they claim happened wouldn't amount to actual malice. So, even if your evidence is in conflict, which it would appear to be because you have claims that are made in the dismissal letters and emails to the employees about sexual harassment, harassment, inappropriate conduct under the village's code, but the two officers who supposedly were the victims of harassment say that never happened. So, we're left with a conflict in your own evidence. Well, they say we weren't offended, and you're correct about that, Your Honor. That's exactly what their testimony is. The point that we're making is to show actual malice. Not only would they have to say that, the claimants would have to show they said it and Peck knew it. And that's the breakdown here. Peck didn't know it. There's no evidence that he knows it. In fact, their evidence, their contention is that he didn't investigate. That's why he didn't know that. Now, Dr. Mitchell, on the other hand, is slightly different with respect to the defamation. She's alleged to have known it, but there's no indication and there's no allegation that she shared it with Peck. Do you represent both Peck and Mitchell? I do represent both Peck and Mitchell, and that issue didn't come up until later in the case. But remember, for that particular, those letters, Dr. Mitchell didn't write them, is the thing. Peck wrote them. He's the one who's attributed with them, but again, that's an element of the claim. That's really not the issue that I'm getting into here. And I'm trying to figure out where to go back. I didn't... I didn't mean to sidetrack you to that extent on that issue. I had anticipated speaking mostly about the free speech claims right here. And essentially, in a nutshell, the argument we were going to make about the free speech claim is that they're entitled to qualified immunity. You know, under the test, first you got to ask, was there an actual constitutional violation? Second, was the law clearly established? For them, we contend that it wasn't public concern speech. It wasn't protected, I should say, because one, it wasn't public concern speech. And two, reasonable officials could disagree as to whether the plaintiff's interest in the speech outweighed the defendant's interest in an orderly police department. Judge Duncan, you happen to be on the panel for the primary case, one of the two primary cases we cited, the Brickey case. The Brickey case, Brickey v. Hall, the court went to great lengths, and by the way, Brickey is a very recent case, published case, 2016 from this court, where the court held, this court held, it was clearly established in 2012 that police officials are entitled to speech than other public employers because police forces are paramilitary. Discipline is demanded and freedom must be correspondingly denied. There's a heightened need for discipline, and police officials have greater latitude in dealing with dissension in their ranks. One of the interesting things about this, the plaintiff's contention on this is that the speech was not disruptive because they weren't offended by it. But the problem is, their bosses were offended by it. I thought their argument was that the speech was not, that their speech was public, that their speech was on questions of public concern. That's just the morale of the department and the qualifications of leadership and the statements that have been made in the press, which might or might not have been accurate about certain qualifications. Yes, Judge Duncan, that's correct about their public concern argument. When we step into the second part, and I apologize, I hadn't talked about Pickering Connick. That's where you want to hang your hat, is the clearly established part. Yes. Well, and also, if you look at it, when I'm talking about clearly established law, when we're talking about that, the reason, the big reason they're entitled to qualified immunity is because no police official, after they looked at Brickey versus Hall and Kraus, would look and say the Pickering Connick balancing undoubtedly would come out in favor of the claimants in this one. The comments that they were making, the homophobic jokes, again... So it was Brickey before or after they did this text exchange? I apologize, Judge... So it was Brickey before or after they did this text exchange? The decision in Brickey came out after, but the court's holding in Brickey was that it was established as of 2012 that, what they, what the police officials could do. And the Brickey District Court opinion was before, obviously. So I guess the big issue for Brickey is Brickey holds that as of 2012, which would cover this time period, the law is clear, according to this panel, or not this panel, this court, that police officials can put great weight on the fact that these comments that were being made directly impugn the superiors. This is a small department, just like in Brickey and in Kraus, 20 officers in total. And there's no way that an ordinary police official could distinguish the difference between the holding, what ends up being the holding in Brickey and Kraus, versus Liverman, I think is the case that the plaintiff cites, or a firefighter case. These cases are very close, very factually analogous. And the court's holding here that, hey, every reasonable official would have known as of 2012 they could fire people under these circumstances. Now, that's not fair notice to my clients. This is a lightning bolt to them, because remember under, you know, as we pointed out in our brief, the clearly established standard for qualified immunity is the same standard as for criminal liability, the fair notice standard. That comes from Hope v. Pelzer and U.S. v. Lanier explains that. The law has to be so clear and it has to put you on such clear notice that you could be criminally prosecuted for civil rights violations. And in light of the existing case law, that just didn't happen here. I assume you're speaking to the First Amendment claim there. Yes, Your Honor. About the liberty interest claim. Right. Now, the liberty interest claim is a little bit different. You know, in the liberty interest claim, they were given pre-termination process. One of the officers, Cannon, never asked for a hearing. In fact, skipped his pre-termination. What about the others? They asked for it. And it was denied. And that's where we get into the qualified immunity argument on this. Codd v. Velger and some of the other, I cited, I believe, a Fourth Circuit case that pointed out that if you don't dispute the underlying factual allegations, if you don't dispute the underlying factual allegations, there's no need to have a grievance hearing. That's the reason for having a grievance hearing. I mean, I don't know that that makes any difference. I mean, the factual allegation is, was there this, you know, string of text messages, yes or no? But the point is, whether or not the conclusions that the employer came to, classified in these derogatory ways, was there a dispute over that? Well, that never came up. And it didn't. It didn't. Would that be the purpose of the name-clearing hearing? And as we pointed out in our brief, our argument was, well, all they were arguing about was whether or not the speech that they admitted making fell into one of these categories or not. And Peck didn't know that at the time. That's all they wanted to argue about. He thought they just wanted their jobs back. And that was, again, a mistaken... Well, without having the hearing, how would you know that? Now, Your Honor, one of the other bases, he wouldn't have. He wouldn't have. He didn't get that far. But one of the other bases was, there is a circuit split on whether compelled disclosures implicate a liberty interest or not. This Court hasn't yet addressed that issue. We cited published Sixth Circuit opinions saying they don't. This is a compelled disclosure. The reason this letter got out... Peck wasn't compelled to email all the employees of the town and make these allegations public to them. That was not involuntary. But, Your Honor, now that... If you want to talk about qualified immunity on that, there's no case law out there that we're aware of that the plaintiffs cited that that's a public disclosure for the purpose. It's an internal disclosure, certainly. And may support defamation liability. But the case law hasn't clearly established that that would have made out a liberty interest violation. Again, all we have to show to get qualified immunity is that there's unsettled case law on one of the elements of their claim. And we've shown that here. Qualified immunity is a pretty high bar for the plaintiffs to get over. There's no dispute that there's a circuit split about that one issue, about the compelled disclosure. So, you know, we contend that they're entitled to qualified immunity. There were other reasons that they did have some alternative remedies. They could have, for example, placed a statement in their personnel file under the policy. Or they could have contested just the contents of what was in their personnel file under the village's policy. But none of them ever asked for that. Again, I do have two clients here. One of mine, Mitchell, that was the issue about qualified immunity for her. She didn't have any involvement in their post-termination process. She was out of the picture by that point. Thank you. Thank you. You have reserved some time for appellees. Yes, Your Honor. Thank you. Mr. Cox? Thank you, Your Honor. May it please the Court, I'm Bradley Cox. I'm representing the appellees in this case, Thomas Cannon, Jesse Conner, D.J. Coons, and Nick Nicholas Terrell. I'll go ahead and start with the defamation since that's where we started. Mr. Blanchard is making a nice argument that he can then knock down. It was an argument that we didn't make. We are not making the argument. We have jurisdiction to hear any of these arguments. Your Honor, I did not brief the jurisdictional arguments. Any thoughts now about it? Since we have to get to it first. Yes, I understand that. I really don't. I mean, I'm here. I'm ready to argue. Is falsity a part of the defamation inquiry? Falsity? Yes, sir. Yes, sir. Why does that not speak to it? Well, I think that the falsity, what Mr. Blanchard was talking about regarding the qualified immunity and trying to bring this in under the pendent jurisdiction. Honestly, I can't speak to it here today. I didn't brief that. We went ahead and briefed in the... You would have an opinion as to whether or not it's appealable. Your Honor, our initial review of it after looking at the matter from Mr. Blanchard and their point of view, we thought that there was at least an argument that it would be appealable and we thought the better course strategically was frankly to just go ahead and let's make the arguments. Of course, if that issue is not appealable, then we would dismiss it, which would be in your client's favor. Then we go back down to the district court case. We have to try it and then we might have to come back. Well, that's what you want to happen, isn't it? That may be a bad strategic call, but that's what we did. Okay. Okay. But I will say that in regarding the malice element, we are not arguing that Mr. Peck should have done an investigation. That's not our argument. Our argument is Mr. Peck lied about why he terminated him and he admitted that he lied about why he terminated him. He admitted in his deposition that he fired him for being jerks. He did not say that he fired him for harassment, sexual harassment, discourteous treatment, inappropriate electronic communications, like he put in his mass email and like he and Mitchell went and took out of the personnel policy in order to fire them immediately. So is that evidence sufficient for summary judgment purposes to show falsity? Or the element of actual malice? Is that your point? That shows that there was certainly evidence to defeat any type of summary judgment argument regarding the malice. As far as the disputing of facts. Because the claim was false. Mr. Peck's claim was false. Yes, sir. That is, they were, and he knew they were, and he knew they were false. The only thing he didn't know was what Mitchell knew. And we do contend that that mass email was made public. It was sent to all of the employees in the village. Not just the public safety officials, but everybody. Plus part-timers who are consisting of part-time folks, volunteers. And there was nothing in that email saying that it was confidential. Going to the free speech issues, and we talked about this being a matter of public concern. And... Focus on the clearly established. Sure. I would like... Go ahead. At some point, talking about whether they were speaking as public citizens. And that feeds into clearly established. I think a plausible argument could be made that this is just trash talking. A lot of it was vulgar. A lot of it was filled with sexual innuendo that I had to ask for assistance deciphering. It just sounds like locker room talk to me. So why were they speaking as public citizens? Well, first of all, this is, what we have is mixed speech. You have some speech that is clearly not of public concern. And then you have other speech that we would contend clearly is of public concern. And just because you have speech that is not of public concern, does not waive your free speech constitutional protections for the matter that is public concern. The matters that are of public concern are the matters of public safety. And they're not just of public concern. They're of utmost public concern or the highest public concern based on the, that's what the case in Goldstein versus Chestnut Ridge volunteer fires. Except that even the statements about safety were tinged with personal grievances. This, there is, if there is a mix, if there is a dividing line, then I think I would give it 30% public safety and 70% trash. Well, again, there have been cases, the Campbell case, where there was just one line about sexual harassment or one complaint about sexual harassment in 13 pages of what the court said. These are all personal grievances. I think if you look at these text messages, a lot of it are even the jokes. And certainly the public safety is not a personal grievance. It's not, I am being affected because I, you're not doing this for me. This is you, I'm not able to get the training. And by the way, they're lying to the public about what training I'm getting. That's, that's not, I didn't get a raise. I got demoted or you're not helping my career. That's a personal grievance. This is much more broader than that. This is on the public safety issue. Some of it is, yeah. Yes. So if you win on it, still you know where, if you don't show, it's clearly established. Right, that gets you to. So going to the clearly established. And I think, again, the other side primarily argues. Yes, sir. The, what you have to show there is that under the Ashcroft is that the government official's conduct violates clearly established law. So what would be, you say, would be your best case that has some facts we can analogize to. The Cromer. That this is clearly established. Cromer versus Brown case. The Cromer versus Brown case, you had, and again, this is the Pickering balancing test. And we're saying they don't have anything on their side of it. They don't have anything to balance it. And that's what Cromer talked about. In Cromer, you had a matter of highest public concern. You had something that was made by a significant number of officers, like you have here. You have, it was not made public. So there's no issue about undermining the department in the public eyes. You already had bad morale. And again, that's what Cromer said. And there was no direct working relationship with the leadership. In this case, we're talking about lieutenants and officers discussing these issues. They didn't have a direct working, or daily working relationship with the chief, and certainly not the town manager. So the Pickering test is so balanced on our side of it that it's clearly established. And that's exactly what Cromer said. They said that they found that the defendants there did not meet their burden for their qualified immunity defense. So that's the best case. But then you can also look at the Hunter v. Town of Moxville case, which is a police department case. The Durham v. Jones case. These are both Fourth Circuit cases, and these are both Fourth Circuit cases where there was complaints about misconduct in a law enforcement agency that the defendants were not allowed their defense of qualified immunity. I've also cited four additional cases around the country in four different circuits where you had an employee who was complaining about, a public employee who was complaining about public safety. And again, this qualified immunity defense was not given. The only thing they... But that feeds back into my question about the nature of the talk. And here, there was a lot of talk that, in fact, I think the disproportionate amount of the talk did not address public safety. And even the public safety comments were phrased in terms of personal grievances against individuals. So, if I'm having difficulty making that call about the public-private dichotomy, doesn't that also speak to whether a reasonable person in this position would have known that they were speaking as public citizens if I'm having trouble, given what I do for a living, making that call? Well, I think that's one part of the various factors that Cromer put out. That, well, was this speech a matter of highest public concern? Did it affect the safety? Was it talking about public safety? And again, the long-established law is, you look at all the speech altogether. I did. I read every painful word. Right. Which, you know, they put together. I don't, you know, we don't know how many texts were before or after, but they're the ones that brought this together. Well, you had input into the Joint Appendix. Yes. Yes, Your Honor. Your Honor, what I mean is we don't know what texts were before July 25th or after August 15th. Because some of the, especially the early ones, they weren't talking about public safety. But when you get into it, it's clear that the, it's clear to me that the major point that they were all focused on was this article that came out in the State Port Pilot that says, hey, look at this. They're saying we're all trained. Somebody's going to die. That's what they said. Mr. Blanchard said there's no case in the Fourth Circuit to address compelled disclosure. Do you agree with that? Compelled... Well, what they're trying to... And does it make a difference in this case? Well, what the law is is from the Cialino case about... And they established the elements. There are four elements. Placed a stigma, made public, made in conjunction with a termination or demotion, and false. They don't say anything about volunteer or compelled. Yes, sir. But they're not allowed to just make up an element and add it to Cialino. Oh, yeah, and also you have to have, you also have to, it has to be voluntary. So the split in the other circuits is not effective in both circuits? Well, the Fourth Circuit, out of all the other ones in dicta, I would not even call that much of a split, first of all. Second of all, under Ashcroft, you don't get the benefit of... The clearly established law looks at the controlling authority in that jurisdiction, in the Fourth Circuit. The only place this is controlling authority is in the Sixth Circuit. Or a consensus of cases of persuasive authority. The only thing they've cited in the Fourth Circuit is one district court case and a second district court, unreported district court case, which cites to yet another unreported district court case. So it's not controlling and it's not persuasive. Well, does it make a difference here since you've got this email blast that goes out to all the employees? Well, I think the difference there is that Defendant Peck was the one that sent the email out. We don't have any evidence that Defendant Mitchell had any responsibility regarding the email. Defendant Mitchell was the one that sent the Form F5B that they're arguing was compelled. Well, under your theory, wouldn't that be sufficient to take care of Defendant Peck for your purposes? Yes, Your Honor. Absolutely. So you have the three. You have the providing the Form F5B to the commission, emailing the department staff, and providing copies of the termination letter to the media after receiving FOIA requests. Yes, Your Honor. I'm not arguing, right? I'm just establishing the universe. Yes. Is your argument the same with respect to each? Essentially, yes. There are some nuances regarding whether or not it was compelled regarding the Form F5B. And then, which one of the defendants did what. They were both involved regarding the actual termination letters. You mean the responses, the person who incorrectly believed that it was appropriate to release termination letters in response to FOIA requests, even though it was a personnel letter? It's not under Cialino again. It's not so much releasing the letters to the newspaper. It's putting the letters in the personnel file where there was a likelihood that they would be released to the public or to other prospective employers. So you wouldn't put a termination letter in a personnel file? You would. You would under North Carolina law. Yes, you do. And that's where it was. So is your argument that that in and of itself was sufficient to prove your due process liberty, interest, deprivation? Yes, Your Honor. Under Cialino. Saying that that was a personnel file case. There was information in that personnel file. And just to complete the laundry list. Sure. With respect to falsity, you rely as you do under the defamation claim. Well, let me ask you, what do you rely on for falsity? As far as the falsity is that the they admitted that they did not terminate them for the reasons that were either in the Form F5B or in the mass email or in the termination letter. They said they fired them for being jerks and talking. Yes. That's what they said. So they've admitted it. Which is kind of a nice way to say inappropriate email communications and difficulty getting along with people. Isn't that kind of a vernacular? Well, the problem is inappropriate electronic communications is defined in the personnel policy and it says something that can be easily accessible on the internet. Well, these are text messages and they can't be. But they didn't care about that. And certainly, they didn't care about the sexual harassment which was also defined in the personnel policy. It defined exactly how the courts define it when they're looking at this type of federal claims. They didn't... And when I asked them in deposition, they couldn't tell me it was. They couldn't point to anything that was. That's all in the record. Let me just move on with my last three minutes here regarding the issue of the quote unquote pre-termination hearing. It is not our contention that the law in the Fourth Circuit requires a adversarial pre-termination hearing. What our argument is is that it under Cialino quoting the Armstrong Supreme Court case is that there has to be a meaningful opportunity to respond to these false and stigmatizing charges in a meaningful time. Cialino says a meaningful time is before this dissemination of the of this false and stigmatizing information ruins the reputation. So... And again, we're talking about qualified immunity. We don't have to worry about well, was the process was the pre- termination process or opportunity was that meaningful or was it meaningful? There was no opportunity. These guys had no idea what was going on. They got to work that day and they said you need to come talk to us. They weren't given even five minutes notice. They were told you're terminated. The only question they asked was do you recall being in some email or text messages in August from July to August in 2014? That's the only thing that they asked. And then it said you are terminated. And it said there is no right of appeal. Turn in your badge and gun. Escort it off the island. Now these that is not any type of meaningful opportunity. That's zero opportunity to argue and to have anything to protect their reputation hours after that after Mr. Peck said oh, we won't release this to the public. Don't worry. Hours after that he sends that email to everybody on the island. And then 24 hours and then puts it in the personnel file and 24, 48 hours later it's in the newspapers. So and they they called Tom Cannon on the phone because he wasn't there and they said can you come in tomorrow? He says no. He says okay, well you're terminated. You'll get your letter in the mail. That's not an opportunity much less any type of meaningful opportunity. So we're not again we're not trying to say that there has to be a full adversarial hearing but there has to be some sort of meaningful opportunity and we don't even have to decide what we don't have I'm not asking the court to sort of check off the boxes and say this is this is the test now because you can go back to the Matthews case in the Supreme Court. We've already said that but again there's no there's no opportunity here. I believe that's all of my argument if you have any additional questions. Thank you. Thank you very much Mr. Cox. Mr. Blanchard. Yes, thank you Your Honor. Judge Duncan I want to get back to a point that you raised just a minute ago. You hit the nail on the head in this one when you made the comment about this being mixed speech and being 70% trash talking essentially and 30% of things that may have have touched on a matter of public concern but were tinged with personalized grievances towards the employer. That's exactly what happened and as you said you know this that is that is wrong. And you're right and the reason that's important yes if you agree with Judge Duncan's assessment of it that's it. Campbell he talked about I think I was expressing my sense of it rather than well an assessment that should carry anyway Judge Duncan that's correct. The point that I was making is that a reasonable police official could have viewed could have viewed the speech that way and if they did and if they did then it's not protected or at least they get qualified immunity because Campbell I briefed Campbell you know I was involved in that one Campbell Connick versus Myers tells us what do you do in a mixed speech situation right you look at the form content and context so it's not just the content that's what they're talking about it's also the context and you talked about the context it's trash talking between these employees in Campbell versus Galloway for example yes you know the plaintiff's argument was essentially the same as it is here the plaintiff in that one said Amy Campbell said well I was complaining about discrimination and that's public concern speech and this court held no no it's not necessarily public concern speech you can't have a categorical rule like that because you take each case on its own and where it's mixed if a reasonable official if it's close to that gray hazy line they get qualified immunity that's what you're seeing in all these mixed speech cases the the the two cases that we talked about earlier Rickey and Krause both mixed speech some parts of it arguably were public concern and they dealt with serious allegations of of misconduct this this there's no allegation the things they're talking about is you know these crude jokes about their genitalia and things like that I mean this is shop talk I think I think we I think we take your point and my my only reason for raising it is that I think it absolutely ultimately turns on qualified immunity but in this instance it seems to me it was a little more that the qualified immunity analysis was at least informed by the nature of the mix you're you're exactly right your honor and the compelled disclosure arguments that we talked about earlier we asked about you asked Judge Winn about a circuit split and and the the point we were making is that it hasn't been directly addressed in the Scalino didn't directly address that issue and the two district court cases I apologize your honor it didn't include the element I think it's a circuit I don't know if it's more viewed as an affirmative defense or if it's a situation where that element is not present when it's a compelled disclosure but the point we were trying to make is that two post Scalino district courts including one in the western district of North Carolina Jensen and the Louis case from Baltimore both held that that a compelled disclosure didn't implicate a liberty interest they both came after Scalino and both of them were affirmed that the Scalino case is a four circuit case everything those district courts say all around is not going to clearly establish any law in this four circuit your honor I agree with you that it won't clearly establish law what is said in other circuits but what's important is that it didn't address that particular issue it didn't directly address that nobody raised it as a defense they decided it without including that I think partly because nobody raised it as an issue in the two cases where it was raised again they're both unpublished opinions but Lee and Jensen the fourth circuit affirmed the district court's dismissal and it did include this word again unpublished opinion I agree that does not establish law I'll go even further than that your honor to tell you that the fourth circuit didn't reach those issues in Lee or Jensen but the point that I'm making is that trained judges come to the conclusion that a compelled disclosure doesn't implicate a liberty interest and McVeigh versus Stacy Wilson versus James Lane all of those  cases from this circuit and the U.S. Supreme Court say if judges disagree about the issue I'm still reeling from the implication that there are untrained judges well let me ask the question that sort of I've been thinking about in this case in general and that is in this village policy can someone be insubordinate if they complain in private when off duty but they follow orders with their own duty yes I believe they can I believe they can their boss would they expect to be fired that's a simple way to look at it and undoubtedly they would have been put it take it where you're going they're playing poker at one of the houses and they're running their mouth while drinking and stuff that can be insubordination even though none of it is ever manifested on the job if it if it causes a breakdown in the relationship between them and their boss yes yes your honor um thank you very much we will come down and greet counsel and then take a very very brief recess your honor we'll talk to you at the brief
judges: Allyson K. Duncan, G. Steven Agee, James A Wynn, Jr.